UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL DOCKET |
| | * | |
| VERSUS | * | NO. 12-138 |
| | * | |
| GIE PRESTON, ET AL. | * | SECTION: "K" |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE AND STATEMENT

Gie Preston has moved this Court to suppress evidence and statements obtained him based on illegal arrests and searches and in violation of his Fifth and Sixth Amendment rights to counsel. For the reasons described herein, he respectfully urges the Court to grant his motion.

### PROCEDURAL HISTORY AND RELEVANT FACTS

On March 22, 2012, Gie Preston was indicted in a six count indictment with charges related to drugs and guns. Rec. Doc. 1. The charges resulted from two separate arrests and relate variously to either the first or second arrest.

Counts 1, 2, and 3 are the product of the January 11, 2011 arrest. Count 1 alleges that Mr. Preston sold crack from December 2010 to January 11, 2011. Count 2 alleges that Mr. Preston possessed a Taurus .40 caliber pistol in furtherance of selling crack. Count 3 alleges that Mr. Preston possessed that firearm notwithstanding a prior state manslaughter conviction.

Counts 4, 5, and 6 are the product of the December 8, 2011 arrest. Count 4 alleges that Mr. Preston possessed crack on that date with the intention of selling it. Count 5 alleges that Mr. Preston possessed a FN Herstall 5.7 x 28 mm pistol in furtherance of selling crack. Count 6 alleges that Mr. Preston possessed that firearm notwithstanding a prior state manslaughter conviction.

A June 6, 2013 superseding indictment added six co-defendants to the case and two additional charges. Rec. Doc. 35. The first additional charge, Count 1, alleged that Mr. Preston and his co-defendants were involved in a conspiracy to possess and distribute 280 grams or more of crack. The second additional charge, Count 2, alleged that Mr. Preston and his co-defendants were involved in a conspiracy to possess firearms in furtherance of their drug trafficking. The superseding indictment included another six charges against Mr. Preston that were essentially the same as the charges in the prior indictment.

*January 11, 2011 Arrest, Search, and Statement*

In December 2010, New Orleans Police Department Officer Brian Pollard commenced an investigation of Gie Preston based on his stated belief that Mr. Preston was selling drugs on the 1300 block of Simon Bolivar Avenue. Exhibit A, NOPD Police Report, Item No. L-28227-10, p. 5. That block runs along side the Guste Housing Development, where Pollard was a liaison officer and worked a detail. *Id*. From a location in the multi-story Guste apartment building on December 20, 2010, Pollard claimed to have an "unobstructed view" of a man named Mark Dupas purchase crack from Mr. Preston "on the downtown side of Simon Bolivar near Clio Street." *Id*. He offered the following account of what he claims to have seen:

> A brief conversation took place between the two subjects and at which time Dupas removed an unknown amount of U.S. currency from his right side jacket pocket and hard it to Preston in exchange for an unknown object Preston removed from his mouth. Officer Pollard observed Dupas receive the object from Preston with his right hand at which time the two parted ways.

*Id*.

According to the police report, Pollard then stopped Dupas "a short distance from the transaction location" where he picked up a piece of crack from the ground where Dupas had thrown it down "with his right hand." *Id*. Pollard claimed that Mr. Preston "fled on foot" before other officers who he had called to arrest Mr. Preston arrived. *Id*. Dupas was arrested and charged with

2

possession of crack. *Id*. Pollard then obtained an arrest warrant from an Orleans Parish magistrate based on an affidavit with this same account. *Id*. at 8.

However, Pollard's account of what occurred is contradicted in numerous significant respects by Dupas, who in cooperation with the Government in this case was interviewed by Special Agent Henry Meyer of the ATF. In that interview, in the presence of his court appointed attorney and Assistant United States Attorney Abe McGull, Dupas explained that (1) while Pollard's report had stated that the drug transaction took place on the street that it actually took place in the rear of a residence, (2) that Pollard's report had stated that Dupas had thrown the crack to the ground with his hands while it actually had been in his mouth, and (3) that Pollard's report had stated that "he was walking but he was on a bicycle." Exhibit B, May 10, 2012 ATF Report of Investigation.

Pollard allegedly continued his surveillance on two other occasions and "observed Preston conduct what Detective Pollard believed to be hand to hand narcotic transactions, accepting currency for crack cocaine that Preston had in his mouth." Exhibit C, NOPD Police Report, Item No. L-28227-10, January 18, 2011, p. 4.[1]

Pollard's representations concerning his observations of the three drug transactions led to an investigation by the NOPD's Sixth District Narcotic Unit and also comprised a significant portion of the affidavits supporting search warrants of Mr. Preston's car and home:

> In the month of December Detectives from the Sixth District Narcotics Unit received information from Detective Brian Pollard who is the liaison officer to the Guste Development. Detective Pollard advised the Detectives that a subject identified as Gie Preston was selling narcotics in the 1300 block of Simon Bolivar. Detective Pollard advised through his investigation, he learned that Preston, who resides in an apartment complex at 1327 St. Phillip Street, would relocate to the 1300 block of Simon Bolivar utilizing his Grey Acura, displaying Louisiana license plate TVC 196. Preston would then sell crack cocaine that he

---

[1] Based on undersigned counsel's review, the discovery provided by the Government to date does not include police reports regarding the details of either of these two alleged drug purchases.

3

> had in his mouth. Based on information that Detective Pollard obtain [sic], Detective Pollard was able to on three separate occasions conduct surveillance in the 1300 block of Simon Bolivar and observe Preston conduct what Detective Pollard believed to be hand to hand narcotics transactions, accepting currency for the crack cocaine that Preston had in his mouth. Detective Pollard corroborate [sic] his surveillance by conducting investigatory stops on the subjects that he observed purchasing the narcotics and locating crack cocaine from the subjects and placing them under arrest for possession. Detective Pollard also prepared arrest warrants for Preston for distribution of crack cocaine.
>
> Based on the information Detective Pollard developed and Detectives prior knowledge of Preston, the Sixth District Narcotic elected to further investigate.

Exhibit D, Search Warrant and Return for 2003 Acura, and Exhibit E, Search Warrant and Return for 1327-29 St. Phillip Street.

The further investigation primarily involved efforts on the part of NOPD Detective Jayson Germann, who claimed to observe additional hand to hand narcotics transactions involving Mr. Preston from a surveillance position on the 1300 block of Simon Bolivar on two occasions but he had "negative results" when "detectives attempted to conduct investigatory stop [sic] on potential buyers." Exhibit C, NOPD Police Report, Item No. L-28227-10, January 18, 2011, p. 4. Finally, Detective Germann and another officer, Detective Evan Cox, reportedly had a "confidential informant" make a "controlled" crack purchase which the officers said they observed. *Id*.

Based on the representations including Pollard's reports concerning Mark Dupas and the other buys he claims to have observed, Germann's reports concerning his observations and the controlled purchase by the confidential informant, the fact that "the Sixth District Narcotic unit is familiar with Preston to include a June 18, 2009 narcotic arrest for distribution of narcotics" and a prior manslaughter conviction, police sought and obtained a warrant to search Mr. Preston's car, described as a "2003 Acura, License Plate TVC196," and home, described as a "[s]econd floor wooden structure attached to the rear of the brick apartment complex labeled with the

municipal address of 1329/1327 St. Phillip, New Orleans, LA." Exhibit D, Search Warrant and Return for 2003 Acura; Exhibit E, Search Warrant and Return for 1327-29 St. Phillip Street.

On January 11, 2011 on the 1300 block of Simon Bolivar, Pollard and another officer "detained" Preston in anticipation of arresting him pursuant to the arrest warrant for "the distribution charges" and for the other two purchases reportedly observed by Pollard. Exhibit C, NOPD Police Report, Item No. L-28227-10, January 18, 2011, p. 5. Preston was reportedly read his *Miranda* rights by Germann and advised that he was under arrest for "three counts of distribution." *Id*. In a "search incidental to lawful arrest," $670 was reportedly found in Preston's pants as well as a set of keys. *Id*. He was "questioned . . . about his residence" and told about the search warrants on his car and home. *Id*. Mr. Preston reportedly denied knowledge of the 1327 St. Phillip Street address. *Id*. Using Mr. Preston's car key found in the search, officers then entered, started, and drove the Acura – apparently parked nearby – to St. Phillip Street, where another key found in the search was used to enter Mr. Preston's apartment. Mr. Preston was also driven over the St. Phillip Street during the execution of the search warrant. During the search of the apartment, officers reported finding "paraphernalia used to package crack cocaine" including "an open box of sandwich [bags], scissors, a bottle of mannitol, a razor blade and a digital scale," $2,260 in cash, a bag of marijuana, and documents connecting the apartment to Mr. Preston. *Id*.

Following the search of the apartment, officers drove the Acura and Mr. Preston to the Sixth District police station. *Id*. There, Cox opened the hood of the Acura and reported finding "a loaded 40 caliber handgun next to the wheel well" and "an extra magazine to the handgun wedge[d] under the frame near the window." *Id*. at 5-6.

Germann then interrogated Mr. Preston regarding the gun. *Id*. at 6-7. Mr. Preston denied knowledge or ownership of the gun and offered that a "variety of different people" have used the

5

car. *Id*. When Germann interrogated him further and demanded specifics, Mr. Preston invoked his Miranda rights: "I am not going to sit here and incriminate myself or incriminate anybody else. I am just going to remain silent." *Id*. at 7. But Germann continued the interrogation as follows:

> Germann: Ok you don't want to[].
>
> Preston: You are listening to[o] slow man.
>
> Germann: I am sorry. But you are not mak[ing] sense and that's just what I am trying to figure out. You don't want to give any other statements? That's fine.
>
> Preston: Y'all could have probably put it under there for all I care but I am not pin pointing say y'all did. For the simple reason that I don't know.
>
> Germann: Ok.
>
> Preston: You know what I am talking about because I never seen [] who know what I am talking about. I never did see no gun or possessed no gun. So I am not going to say that you put it there or your partner put it there. I am not going to say none of my homeboys put it under there. If you found it under there then therefore I am going to take the charge for the simple reason that its my fucking car you know what I am talking about. I just know better next time. Mother fucker don't get my keys that's it.
>
> Germann: Ok.

*Id*. at 8.

Mr. Preston was then charged at Orleans Parish Criminal District Court with multiple counts of possession with intent to distribute crack, being a felon in possession of a firearm, and possession of marijuana. Putting aside the marijuana charge, the conduct allegedly underlying these charges are subsumed by the counts 3 to 5 of the superseding indictment as well as the conspiracies charged in counts 1 and 2.

*December 8, 2011 Search and Arrest*

On the afternoon of Thursday, December 8, 2011, Gie Preston and Darius Williams were together on the street in front of 2105 Thalia Street in New Orleans. Officers Harold Nunnery and Eric Guillard were in a Sixth District police car "heading north" on Thalia when they saw the men, stopped the car, emerged with their guns drawn, and, according to the police report, ordered Mr. Preston to the ground and ordered Mr. Williams to walk over to the police car.[2] Exhibit F, NOPD Police Report, Item No. L-11959-11, December 12, 2011, p. 5.[3] In a police report, the officers asserted that this "investigatory stop" was justified by the fact that they saw "two unknown black males involved in a verbal altercation" with one of the men, who was later identified as Mr. Preston, "holding a large screw driver in his right hand while arguing with the second suspect . . .." *Id*. More specifically, they reported that Mr. Preston had the screw driver in his right hand, which was by his side, while he was pointing to Mr. Williams with his left hand and yelling at Williams. *Id*.

According to the police report, Mr. Preston did not respond to the officers' initial "command" that he drop the screwdriver but complied "[a]fter more verbal commands by S[ergeant] Gillard . . .." *Id*. Mr. Preston then "laid in a prone position on the ground as instructed" and Gillard "handcuffed Preston, while Officer Nunnery handcuffed Williams for officer safety and pending further investigation of the disturbance." *Id*. At that point, with Mr. Preston handcuffed and on the ground face down on a city street, "Officer Gillard conducted a pat down of Preston and felt a large object consistent with a handgun in his right front waistband

---

[2] Thalia Street is a two way street that runs, in New Orleans directional parlance, toward the Mississippi River, in a southeasterly direction. The officers' assertion that they were driving north suggests that they were driving on Thalia towards Lake Pontchartrain, or northwesterly, prior to seeing Mr. Preston.
[3] *See also*, Exhibit G, January 23, 2011 ATF Report of Investigation.

7

area under his black jacket." *Id*.[4] Then Gillard reportedly removed a handgun, an FN Herstal 5.7 x 28mm handgun containing 20 rounds, from Mr. Preston's waist. *Id*. He also took $150 in cash from Mr. Preston's back pocket. *Id*. A further search by Gillard "located a clear-plastic bag containing 20 individually wrapped pieces of what officers believed to be crack cocaine . . .." *Id*. Mr. Preston was arrested and, back at the Sixth District police station, "interview[ed] by Sixth District Detectives S[ergeant] S. Contreras, Rob Barrere, and Tim Sison."[5] *Id*. at 4.

Mr. Preston was then charged at Orleans Parish Criminal District Court with possession with intent to distribute crack, illegal possession of a weapon while in possession of crack, being a felon in possession of a firearm. The conduct allegedly underlying these charges are subsumed by the counts 6 to 8 of the superseding indictment as well as the conspiracies charged in counts 1 and 2.

   **1. The Evidence and Statement Obtained Following Gie Preston's January 11, 2011 Arrest Must Be Suppressed.**

       **a. The Arrest Warrant and Search Warrant Contained False Information.**

The affidavits submitted in support of the December 20, 2010 arrest warrant and January 11, 2011 search warrants are compromised by their inclusion of false information from Detective Pollard. Both affidavits include Pollard's account that he observed from a surveillance location "hand to hand narcotics transactions" involving Mr. Preston. The arrest warrant specifically names Mark Dupas as a purchaser and provides Pollard's account, the same account in the related police reports, that he observed the drug purchase and then arrested Dupas, who he said dropped the drugs from his hand. Exhibit A, NOPD Police Report, Item No. L-28227-10,

---

[4] The account in an ATF report offered similar details: "Officers conducted an investigatory stop and both subjects were separated. Officers Nunnery and Gillard placed both males in handcuffs and conducted a cursory search for weapons relative to officer safety." Exhibit G, January 23, 2012 ATF Report.
[5] Based on undersigned counsel's review of the discovery provided to date, the contents of this interview have not been disclosed to Mr. Preston thus far in the discovery process in this case.

December 20, 2010, p. 5, 8. The search warrant application relies on Pollard's reported observation of the Dupas buy but does not specifically name Dupas but clearly incorporates this buy. Exhibit D, Search Warrant and Return for 2003 Acura, and Exhibit E, Search Warrant and Return for 1327-29 St. Phillip Street. However, Dupas' account of the buy contradicts Pollard insofar as it makes clear that Pollard could not have had an "unobstructed view" of the buy "on the downtown side of Simon Bolivar near Clio Street" because the buy occurred "in the rear of a residence" rather than "on the street" as stated in Pollard's report. *Compare* Exhibit A, NOPD Police Report, Item No. L-28227-10, December 20, 2010, p. 5, *with* Exhibit B, May 10, 2012 ATF Report of Investigation.

Dupas also contradicted Pollard with respect to other details in Pollard's account including (1) whether Dupas was on foot or on his bicycle and (2) whether he had the crack in his mouth or in his hand at the time of his arrest. *Id*. Significantly, there is little reason to doubt Dupas' veracity on these points as he made them in furtherance of cooperation with the Government at a meeting where he otherwise confirmed Pollard's claim that he had purchased crack and where he stated that Mr. Preston had gotten him to sign a false statement regarding the drug buy. *Id*. Given that Dupas' statements as a whole were not at all self serving and were in some respect damaging to Mr. Preston, there is no reason to believe that his statement contradicting Pollard's account of his observations are untruthful. Moreover, Dupas' contradictions of Pollard's account undermines the veracity of his representations regarding the other two buys he claims to have observed and the affidavit as a whole.

Significantly, Pollard's credibility on this point and in general is suspect. A recent press account described Pollard's "checkered history" with the NOPD including (1) several instances of "payroll fraud" when he was actually "working offduty at Walgreens at the same time he was

9

on the clock for the city," (2) the fact that he is the "coordinator" of an NOPD detail at the Guste Development that is the subject of an FBI investigation and indictments of two officers for similar abuses of the detail system, and (3) the many citizens complaints he has received – four of which were sustained – for misconduct including "intimidation, discourtesy, and lack of professionalism." Exhibit H, Mike Perlstein, "Tower of Trouble: Main Cop in Housing Complex Has Troubling History," November 19, 2013, WWL-TV, available at http://www.wwltv.com/news/eyewitness/mikeperlstein/HANO-detail-232554781.html (last check February 2, 2014). Based on this history, Raphael Goyeneche, president of the Metropolitan Crime Commission, referred to Pollard as a "[a] police officer [who] has demonstrated his lack of integrity." *Id*. The conduct relating to the fraudulent detail accounting resulted in Pollard's suspension from the NOPD for 30 days and a diversion program in Orleans Parish Criminal Court. *Id*. Significantly, the federal indictment of Pollard's supervisees at the Guste detail alleges that those officers "and others" engaged in fraud seemingly identical to Pollard's, wherein the officers "submitted timesheets to NOPD and HANO [Housing Authority of New Orleans, which oversees the Guste Development] with overlapping work periods, seeking payment from each entity for work performed during the same periods of time." *United States v. Dobard, et al*, EDLA Case No. 13-CR-268, Rec. Doc. 8 at 9. While Pollard has not been publicly charged in the case,[6] his role in the supervision of the details and his prior detail fraud is worryingly synchronous.[7]

---

[6] Undersigned counsel has not yet received any information from the Government concerning any prospective superseding indictment charging Pollard.

[7] Officer Germann, the affiant on the search warrant, has a similarly alarming history of misconduct resulting in 37 citizen complaints in just three years and claims that he "terrorizes" citizens "through abuse and intimidation." Richard Webster, "River Garden detail officer subject of 37 complaints over three years," Times Picayune, January 31, 2013, available at http://www.nola.com/politics/index.ssf/2013/01/river_garden_detail_officer_su.html (last checked February 3, 2014). The complaints included, inter alia, "stopping and arresting people without probable

Because both the arrest and search warrants relied on Pollard's representations that appear false in light of Dupas's statements to federal law enforcement, both warrants are defective and the statements and evidence obtained pursuant to each warrant must be suppressed. *Franks v. Delaware*, 438 U.S. 154 (1978). Assuming arguendo that the Court determines that Mr. Preston has not yet demonstrated that suppression is required or that the representations regarding Pollard's observations are false, he is nonetheless entitled to an evidentiary hearing where he can further demonstrate that statements contained in the search and arrest warrant affidavits are both false, made "knowingly and intentionally, or with reckless disregard for the truth," and necessary to the magistrates' findings of probable cause for the search and arrest warrants.[8] *See id*. at 171-72*; United States v. Curry*, 751 F.2d 442, 449 (1st Cir. 1984) (holding the police's deliberate failure to distinguish between father and son in the affidavit required a *Franks* hearing); *United States v. Tate*, 524 F.3d 449, 455 (4th Cir. 2008) (holding agent's omissions about the location of trash was deliberately deceptive and requiring a *Franks* hearing); *United States v. Whitley*, 249 F.3d 614, 624 (7th Cir. 2001) (holding officer's false statements in affidavit was sufficiently reckless to warrant a *Franks* hearing); *United States v. Reinholz*, 245

---

cause" and "filing false reports." *Id*. Subsequently, in September of last year, Germann was suspended from the NOPD after crashing an NOPD car while driving drunk on the Twin Span. John Harper, "NOPD Officer Arrested for DWI, Put on Suspension," Times Picayune, September 1, 2013, available at http://www.nola.com/crime/index.ssf/2013/09/nopd_officer_arrested_for_dwi.html (last checked February 3, 2014).

[8] Beyond the highly speculative and uncorroborated officer statements in the search warrant regarding observations that behaviors are "consistent" with drug sales, the only other non-speculative element to the affidavit relates to a controlled purchase from a unnamed confidential informant that, taken alone, is not sufficient to establish probable cause based on the "totality of the circumstances" and in light of the compromised credibility of some of the officers on whom the affidavit relies. *See Illinois v. Gates*, 462 U.S. 213 (1983). Significantly, the affidavit revealed no information concerning the informant's criminal history or other issues affecting his credibility and his identity remains unknown to undersigned counsel. *C.f. United States v. Reeves*, 210 F.3d 1041, 1045 (9th Cir. 2000) ("In the absence of countervailing evidence to bolster the informant's credibility or the reliability of the tip, an informant's criminal past involving dishonesty is fatal to the reliability of the informant's information, and his/her testimony cannot support probable cause.")

F.3d 765, 774 (8th Cir. 2001) (holding court did not err when it ordered a *Franks* hearing to review the officer's misrepresentation about the source of his information); *United States v. Kyllo*, 37 F.3d 526, 529-30 (9th Cir. 1994) (holding *Franks* hearing was required when material facts were omitted that substantially undermined probable cause of the search warrant); *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992) (holding a deliberate or reckless omission by a government official who is not the affiant can be the basis for a *Franks* suppression); *United States v. Avery*, 295 F.3d 1158, 1167 (10th Cir. 2002) (holding the omission of the informant's lengthy criminal record required a *Franks* hearing). For these reasons, barring outright suppression of the evidence obtained following Mr. Preston's arrest, the Court should order a *Franks* hearing on the allegations of police misconduct in obtaining the warrant in this case.

> **b. The Statement Was Taken Notwithstanding the Fact that Gie Preston Was Known To Be Represented by Counsel on Allegedly Related Drug Charges and Portions of the Statement Followed an Invocation of his Fifth Amendment Rights.**

At the time that Detective Germann interrogated Mr. Preston regarding his alleged possession of gun in the course of alleged drug activities, Mr. Preston was represented by counsel in several other pending cases involving alleged related drug activities. *See* Orleans Parish Criminal District Court Case Nos. 508525 (charged with distribution of marijuana following August 15, 2011 arrest), 491075 (charged with conspiracy to distribute cocaine following June 18, 2009 arrest), 487453 (charged with felon in possession of a firearm following March 24, 2009 arrest). In each of these cases Mr. Preston was actively represented by counsel on the date of his January 11, 2011 arrest. The right to counsel had attached in each case. Moreover, the fact that Mr. Preston had these ongoing criminal cases was clearly known to the officers involved in this arrest given that (1) the Sixth District Narcotics Unit's "familiarity" with Mr. Preston based on his June 18, 2009 "arrest for distribution of narcotics" was included in the

search warrant affidavit and (2) Detective Pollard was, at very least, involved in the investigation and prosecution of the marijuana case and Detective Germann was involved, at very least, in the investigation and prosecution of the conspiracy to distribute cocaine case. *See* Exhibit D, Search Warrant and Return for 2003 Acura; Exhibit E, Search Warrant and Return for 1327-29 St. Phillip Street; Exhibit I, Orleans Parish Criminal Case Docketmasters No. 508525 (referring to Detective Pollard as suppression hearing witness), No. 491075 (referring to Detective Germann as a trial witness). Significantly, given Counts 1 and 2 of the Government's indictment in this case, alleging conspiracies to distribute crack and to possess firearms for drug trafficking dating back to "a time unknown," each of the then-pending charges are related to the charges alleged following the January 11, 2011 arrest.[9] In short, the Government's indictment makes clear that Mr. Preston is charged with being a drug dealer who possessed guns to further his drug activity over the course of his life, relating almost any alleged prior criminal activity to the current conspiracy charges.

The fact that they are related offenses has significance insofar as it extends the attachment of Mr. Preston's sixth amendment rights with respect to the earlier charges to the subsequent charges, including the January 11 and December 8 charges. *See McNeil v. Wisconsin*, 501 U.S. 171 (1991)(the attachment of a defendant's sixth amendment right to counsel does not constitute an invocation of his Fifth Amendment right to counsel that precludes police interrogation on unrelated, uncharged offenses); *Texas v. Cobb*, 532 U.S. 162, 177 (2001). The fact of the conspiracy counts in the indictment makes clear that the attachment of the right to counsel following Mr. Preston's then-pending March 24, 2009 arrest and charges for felon in possession of firearms effectively invoked his Fifth Amendment and Sixth Amendment rights to

---

[9] Significantly, the factual bases for Mr. Preston's co-defendants who have pled guilty in this case trace the drug conspiracy back to the early 1990's. See Rec. Doc. 107.

counsel for all related charges including those alleged in this indictment. The same rationale applies with even greater force concerning any statements taken from Mr. Preston following his December 8, 2011 arrest. Exhibit F, NOPD Police Report, Item No. L-11959-11, December 12, 2011, p. 5. Consequently, any interrogation of Mr. Preston in the absence of counsel, including his January 11, 2011 and December 8, 2011 interrogations, must be suppressed. *See Massiah v. United States*, 377 U.S. 201 (1964).

Assuming arguendo that the Court does not suppress any uncounseled post-arrest statements in their entirety, this Court should nonetheless suppress Mr. Preston's statement to Detective Germann from the point where he invoked his Fifth Amendment rights: "I am not going to sit here and incriminate myself or incriminate anybody else. I am just going to remain silent." Exhibit C, NOPD Police Report, Item No. L-28227-10, January 18, 2011, at 7. *See Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966) ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.") Consequently, Detective Germann's subsequent statements testing Mr. Preston's invocation, leading to several additional comments by Mr. Preston, were improper and consequently those subsequent statements should be deemed inadmissible.

> **c. The Warrant Provided an Incorrect Description of the Searched Property and Was Consequently Invalid.**

The warrant purported to provide police with license to search an apartment described as a "[s]econd floor wooden structure *attached* to the rear of the brick apartment complex labeled with the municipal address of 1329/1327 St. Phillip, New Orleans, LA." Exhibit E, Search Warrant for 1327-29 St. Phillip Street. However, the property search was an *unattached* building approximately ten feet *behind* 1327-29 St. Philip Street. Exhibit J, Google Satellite Images of 1329 St. Philip Street.

The Fourth Amendment requires that a warrant sufficiently particularize the place to be searched so that the executing officers "can with reasonable effort ascertain and identify the place intended." *Steele v. United States*, 267 U.S. 498, 503 (1925). The intention of this level of specificity is to leave "nothing . . . to the discretion of the officer executing the warrant." *Andreson v. Maryland*, 427 U.S. 463, 480 (1976). Warrants that have failed to properly identify the property to be search and narrow that discretion have been found invalid by the Courts of Appeals. *See, e.g., Jacobs v. City of Chicago*, 215 F.3d 758, 767-77 (7th Cir. 2000)(warrant insufficiently particular because it incorrectly described apartment building as single family residence); *United States v. Thomas*, 263 F.3d 805, 807-08 (8th Cir. 2001)(warrant insufficiently particular because only information identifying location was erroneous street and apartment number); *United States v. Dahlman*, 13 F.3d 1391, 1395-96 (10th Cir. 1993)(warrant insufficiently particular because location of search only identified by 2 numbered subdivision lots with no reference to structures on property).

In fact, on information and belief, 1327-29 St. Philip Street is an address with six units, four in the building fronting St. Philip Street, which can be entered from the rear, and a two story unattached building behind that building which contains first and second floor units. There is no wooden structure "attached" to the front building.[10] An officer executing the warrant would be faced with a dilemma regarding whether he would enter the rear doors behind the front building, assuming that was the attached structure, or the second floor door to the *unattached* outbuilding, notwithstanding its departure from the warrant. The warrant's failure to properly describe the property searched, the second floor apartment of the unattached building behind 1327-29 St.

---

[10] The American Heritage Dictionary of the English Language provides the following architectural definition of attached: "Joined to or by a wall, especially by sharing a wall with another building; not freestanding: *a block of attached houses*." The front and rear buildings at 1327-29 St. Philip share no common walls and each is freestanding.

Philip Street, undermines the validity of the warrant and requires the Court to suppress the evidence obtained therein and any statements by Mr. Preston following the search. In the event that the Court determines that the above showing is not sufficient to warrant suppression outright, Mr. Preston is nonetheless entitled to an evidentiary hearing where he can established the facts alleged herein. *United States v. Ramirez-Gonzales*, 83 F.3d 712, 715 (5th Cir. 1996)(reversing district court for failure to hold evidentiary hearing on a motion to suppress evidence regarding a search and seizure issue).

    **2. The Evidence and Statement Obtained Following Gie Preston's Warrantless December 8, 2011 Search and Arrest Must Be Suppressed.**

The broad doctrine arising out of *Terry v. Ohio*, 392 U.S. 1 (1968) provides law enforcement officers with the authority to make a brief, warrantless investigatory stop of a citizen where they have reasonable suspicion that a person is engaged in criminal activity and may frisk that person when the officer has a reasonable belief that the person is armed and dangerous to the officers' safety. *See Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000) (to have reasonable suspicion to frisk an officer must "point to particular, articulable facts indicating that [the person] was armed and dangerous"). Such a stop is something well less than an arrest with the scope and nature of the restraints placed on the individual's liberty, the use of force, and the duration of the stop are acting as relevant factors in determining the reasonableness of the stop and whether it is instead an arrest that required probable cause. *See United States v. Sharpe*, 470 U.S. 675 (1985); *Freeman v. Gore*, 483 F.3d 404, 413 (5th Cir. 2007) ("Police detention constitutes an 'arrest,' such that it must be accompanied by probable cause, if a reasonable person in the suspect's position would understand the situation to be a restraint on freedom of the kind that the law typically associates with a formal arrest.").

16

### a. There Was No Basis for Reasonable Suspicion to Support the Stop or the Frisk.

The police report failed to articulate any reason to believe that either Gie Preston or Darius Williams was engaged in criminal activity when they were stopped or any reason to believe that either was armed and dangerous that would justify their frisks. Exhibit F, NOPD Police Report, Item No. L-11959-11, December 12, 2011, p. 5. Instead, the officers reported seeing two men arguing on the street on a Thursday afternoon in New Orleans. The account refers to a screwdriver in Mr. Preston's hand which was held "to his side." *Id*. Even the report fails to characterize the argument as criminal activity but instead notes that the "officers fear[ed] that the altercation might turn violent and the subjects were about to become [e]ngaged in a physical confrontation . . .." *Id*. Moreover, nothing in the officers' account describes anything about either Mr. Preston or Mr. Williams conduct that would have suggested that either posed a threat to the officers once the stop had been affected, particularly after Mr. Preston dropped the screwdriver. Consequently, the officers' own account fails to establish the requisite reasonable suspicion to justify either the stop or the subsequent frisk. In the city where people speak with great energy and gather and talk on sidewalks and porches, the proposition that an argument was about to explode into criminal violence – as opposed to an agreement to disagree about the cause of last Sunday's Saints loss or who failed the city most during Hurricane Katrina – is unacceptably speculative. *See Estep v. Dallas County, TX*, 310 F.3d 353 (5th Cir. 2002)("However, the contention that a search must be done to protect a police officer must have some reasonable basis in fact. We cannot rubber-stamp a search of a vehicle based on an officer's mere inchoate and unparticularized 'hunch' that a citizen poses an immediate threat of danger. . . . The contention that a citizen poses an immediate danger because he possesses a key chain containing mace, camouflage gear, an NRA sticker, and does not answer questions in exactly the

17

manner the officer desires is not suspicious enough behavior to justify a *Long* 'frisk' of a vehicle. Thus, the search violated the Fourth Amendment.")

However, even this inadequate justification offered by the officers is false. A statement from Darius Williams makes clear that there was no altercation at all but instead that the two men were simply walking down the street to buy cigarettes. Exhibit K, January 27, 2014 Statement of Darius Williams ("On December 8, 2011, Gie and I were about to buy cigareettes from a man who lived in the 2100 block of Thalia Street. All of a sudden, two cops pulled up in their car, jumped out and pulled out their guns at us."). The statement makes clear that the officers' account of the looming fight and the menacing screwdriver is simply an *ex post* fabrication intended to justify a warrantless search and seizure. Without question, the officers had no reasonable suspicion to stop and frisk two men walking down the street to buy cigarettes.

     **b.   This Was Not An Investigatory Stop But Was An Arrest.**

The account of the police officers' seizure of Gie Preston and Darius Williams makes clear that this encounter was an arrest rather than an investigatory stop. The two officers drove up to the two men on the street, emerged from a marked police car yelling "commands" at Mr. Preston to drop an objects in his possession, for Williams to move from where he was standing, and for both men to lie to lie prone on the city street. Exhibit F, NOPD Police Report, Item No. L-11959-11, December 12, 2011, p. 5. Both men were then handcuffed by the officers. *Id*. A statement from Darius Williams makes clear that the officers guns were drawn and trained on Williams and Preston. Exhibit K, January 27, 2014 Statement of Darius Williams ("All of a sudden, two cops pulled up in their car, jumped out and pulled out their guns at us."). Significantly, based even on the officers' account of what occurred, there was no reason to believe that either Mr. Preston or Mr. Williams was armed, and therefore such a robust use of

18

force and restraint on liberty has no counterbalance in this instance. Handcuffed, lying on the ground, getting frisked by an officer that had just pointed a gun at him, Mr. Preston, like any reasonable person in his circumstances, would have understood that he was under arrest. *Freeman*, 483 F.3d at 413. Therefore, given all of the circumstances, the seizure of Mr. Preston was a warrantless arrest made without probable cause and therefore its fruits – the evidence seized and any statements made – must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). In the event that the Court determines that the above showing is not sufficient to warrant suppression outright, Mr. Preston is nonetheless entitled to an evidentiary hearing where he can established the facts alleged herein. *Ramirez-Gonzales*, 83 F.3d at 715.

## Conclusion

Wherefore, Mr. Preston respectfully requests that this Court suppress evidence and statements obtained from him following his arrests or provide an evidentiary hearing regarding the circumstances of arrests, searches, and statements, wherein he can demonstrate to the Court that they were obtained in violation of his Fourth, Fifth, and Sixth Amendment constitutional rights.

Respectfully submitted,

*/s/ William Sothern*
WILLIAM SOTHERN, La. Bar 27884
Law Office of William M. Sothern
3015 Magazine Street
New Orleans, LA 70115
(504) 581-9083
billys@thejusticecenter.org

*Attorney for Gie Preston*

## CERTIFICATE OF SERVICE

  This certifies that I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system that will send a notice of electronic filing to all counsel of record on the 7th day of February, 2014.

                 <u>/s/ *William Sothern*</u>
                 WILLIAM SOTHERN, La. Bar 27884