**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**                                                        **NO. 12-138**

**GIE PRESTON**                                           **SECTION "K"(1)**

## ORDER AND REASONS

Before the Court is Defendant Gie Preston's Motion to Suppress Evidence and
Statements.  Def.'s Mot. Suppress, R. Doc. 118.  The Court held a hearing on
Defendant's Motion to Suppress on March 26, 2014.  For the reasons set forth hererin,
Defendant's Motion to Suppress is hereby DENIED.

**I.**      **BACKGROUND**

On March 22, 2012, the Defendant, Gie Preston, was indicted in a six count
indictment with charges related to drug trafficking and firearm possession resulting from
two separate arrests.  Indictment, R. Doc. 1.  Specifically, he faces two counts of
possession of cocaine base (crack cocaine) with intent to distribute, two counts of
possession of a firearm in furtherance of drug trafficking, and two counts of being a felon
in possession of a firearm.  Indictment, R. Doc. 1.  In addition, a superseding indictment
added six co-defendants to the case and three additional charges: conspiracy to possess
and distribute 280 grams or more of crack cocaine beginning at a "time unknown until on
or about June 6, 2013"; conspiracy to possess firearms in furtherance of drug trafficking;
and conspiracy to possess with intent to distribute a quantity of cocaine base on January
11, 2011.  Superseding Indictment, R. Doc. 35.

1

All charges relate to the Defendant's arrests on December 8, 2011 and January 11, 2011.  In Defendant's instant Motion to Suppress, the Defendant seeks to suppress any evidence obtained following the arrests and searches of December 8, 2011, and January 11, 2011 and any statements made without the presence of counsel after the December 8, 2011 and January 11, 2011 arrests.  Def. Mot. Suppress, R. Doc. 118.  The following reflects the factual basis for the Defendant's motion and the Government's version of the facts.

### A.      December 2010-January 2011 Investigation

The Defendant was arrested on January 11, 2011, pursuant to an arrest warrant supported by an affidavit submitted by Officer Brian Pollard of the New Orleans Police Department (NOPD).  Def.'s Mem. Supp. Mot. Suppress, R. Doc. 118, 2.  In the affidavit, Officer Pollard describes a drug transaction that he alleged took place on December 20, 2010 between the Defendant and another individual, Mark Dupas.  *Id.* at 2, Ex. A.

According to Officer Pollard, on December 20, 2010, Officer Pollard was conducting surveillance of the 1300 block of Simon Bolivar Avenue in New Orleans, Louisiana.  *Id*; Govt. Mem. Opp. Def.'s Mot. Suppress, R. Doc. 135, 1.  Officer Pollard observed an individual, later identified as Mark Dupas, approach the Defendant on the corner of Simon Bolivar Avenue and witnessed Mr. Dupas hand the Defendant currency for an item that the Defendant removed from his mouth and handed to Mr. Dupas.  Govt. Mem. Opp., R. Doc. 135, 1.  Officer Pollard then conducted an investigatory stop on Mr. Dupas, who discarded an item to the ground as he approached Officer Pollard's vehicle, which later tested positive for crack cocaine.  *Id.* at 2.

2

Mr. Dupas's account of the incident varies from Officer Pollard's account, however.   Mr. Dupas was interviewed in 2012 by Special Agent Henry Meyer of the Alcohol, Tobacco, Firearms, and Explosives (ATF) Bureau, in the presence of a court appointed attorney, and explained three factual discrepancies in Officer Pollard's account: (1) the transaction took place in the rear of a residence not on Simon Bolivar Avenue; (2) the contraband (crack cocaine) was not in Mr. Dupas' hand (before discarding it) but was secreted in his mouth; and (3) Mr. Dupas was riding a bicycle when approached by Officer Pollard, not walking. *Id.* at 2, n. 1; Def. Mem. Supp., R. Doc. 118, 3.

On two following occasions, Officer Pollard witnessed the Defendant, Mr. Preston, engage in similar transactions.  On December 31, 2010, Officer Pollard was conducting surveillance of the same block of Simon Bolivar.  Govt. Mem. Opp., R. Doc. 135, 2.  He observed a different individual (later identified as a resident of the Guste Housing Project) approach Mr. Preston, hand Mr. Preston money, and receive something Mr. Preston handed him after taking it out of his mouth.  *Id.*  Officer Pollard approached the individual afterward and asked him to hand over whatever he had, which was two pieces of crack cocaine.  *Id.*  On January 3, 2011, Officer Pollard was again conducting surveillance of the same block, and observed another resident of the Guste Housing Project approach Mr. Preston.  *Id.*  Having witnessed the same type of transaction, Officer Pollard approached the individual and recovered crack cocaine from that individual before arresting that individual.  *Id.*

Officer Pollard informed the NOPD Sixth District Narcotics Unit of Mr. Preston's trafficking activities to further the investigation. *Id.* NOPD Detective Jayson Germann

and other officers began conducting surveillance and observed Preston conduct numerous mouth to hand transactions on the same block of Simon Bolivar Avenue.  *Id.* at 3. Though they observed what they believed to be drug transactions, they were unsuccessful in arresting the buyers as the area had heavy foot traffic.  *Id.*

On January 11, 2011, the Sixth District detectives conducted a controlled purchase from Mr. Preston using a confidential informant. *Id.* The informant was searched prior to the transaction and then given money to purchase the drugs from Preston.  *Id.*  Detectives witnessed the informant approach Mr. Preston, purchase drugs from Mr. Preston, and return to the officers relinquishing the contraband (crack cocaine). *Id.*

Detective Germann then obtained a search warrant for Mr. Preston's automobile and residence.  *Id.*  In Detective Germann's affidavit, he included information as to Officer Pollard's arrest of three of Mr. Preston's drug customers, the multiple transactions witnessed by Detective Germann and others, the controlled purchase, Mr. Preston's criminal history, and the fact that Preston would go to his vehicle in between drug transactions and place an object in his mouth.  *Id.*  As to his residence, the warrant described it as a "[s]econd floor wooden structure attached to the rear of the brick apartment complex labeled with the municipal address of 1329/1327 St. Phillip, New Orleans, LA." *Id.*

**B.      January 11, 2011 Arrest**

After obtaining the warrants, on January 11, 2011, the NOPD officers again witnessed Preston conducting the drug sales.  *Id.* at 4.  Mr. Preston was arrested and read his *Miranda* warnings.  *Id.*  He was "detained" in anticipation of his arrest pursuant to the

arrest warrant.  Def. Mem. Supp., Rec. Doc. 118, 5.  On his person, in a search incident to

arrest, officers found $670 in cash; in his car officers found a .40 caliber handgun under

the hood of the car; in his apartment, officers found drug distribution paraphernalia,

marijuana, and $2,260 in cash.  *Id.* After, he was questioned about his residence, and told

about the search warrants; he denied knowledge of the house address, but after finding

his car keys in the search the officers drove the car to his house where they found another

key to the apartment.  *Id.*

 After bringing Mr. Preston to the Sixth District Police Station, he was again read

his *Miranda* rights and made a statement, which was recorded. Govt. Opp., R. Doc. 135,

4.  Detective Germann interrogated Mr. Preston about the gun, to which Mr. Preston

denied any knowledge or ownership and offered that a variety of people used the gun and

car.  Mr. Preston and Detective Germann then had the following exchange:

> Preston:  I am not going to sit here and incriminate myself or incriminate
> anybody else. I am just going to remain silent.
>
> Germann:  Ok you don't want to.
>
> Preston:  You are listening to[o] slow man.
>
> Germann:  I am sorry, but you are not make [sic]  sense and that's just what I
> am trying to figure out. You don't' want to give any other statement? That's fine.
>
> Preston:  Y'all could have probably put it under there for all I care but I am
> not pin pointing say ya'll did for the simple reason that I don't know.

Govt. Mem. Opp., R. Doc. 135, 5.

 Mr. Preston was then charged at Orleans Parish criminal District Court with

multiple counts of possession and intent to distribute crack, being a felon in possession of

a firearm, and possession of marijuana.  Def. Mem. Supp. R. Doc. 118, 6.

### C.       December 8, 2011 Arrest

On December 8, 2011, NOPD officers Harold Nunnery and Eric Gillard were on patrol in South Saratoga and Thalia Streets. While driving north on Thalia, they saw two men engaged in "verbal and physically threatening conversation." They also saw that one of the men was holding a large screwdriver in a "menacing fashion."  Govt. Mem. Opp., R. Doc. 135, 5.  "Believing a fight was about to take place," the officers conducted an investigatory stop. Upon exiting their vehicles "with their guns " they asked Preston to drop the screwdriver, but he hesitated.  *Id.* at 4; Def. Mem. Supp., R. Doc. 118, 7. They again ordered him to drop the screwdriver, to which he complied. After that, for safety, they ordered him to lay on the ground and handcuffed him, while the companion, Darrius Williams, was placed in handcuffs near the police car.  Govt. Mem. Opp., R. Doc. 135, 4. Once secure, they performed a pat-down of Mr. Preston and discovered a handgun in his waistband.  *Id.* In addition, the officer removed $150 cash from his back pocket and a clear-plastic bag with 20 individually wrapped pieces of "what officers believed to be crack cocaine." *Id.*

Mr. Preston was then placed under arrest and advised of his *Miranda* rights.  *Id.* at 6.  Once driven back to the Sixth District Station, the officers again read him his *Miranda* rights. At that time, detectives from the Crimes Against Person's Unit (Detectives Sergeant Contreras, Rob Barrere, and Tom Sisson) not involved with the narcotics investigation but who had been investigating a series of shootings involving shell casings from the a 5.7 x 28 mm handgun (consistent with Mr. Preston's) were brought in to the room to question Preston about the shootings.  *Id.*  Preston allegedly responded "in

substance, that while he had the gun in his possession that day, the gun normally was kept under a house for anyone's use and therefore he had no idea who many have had the gun at the time of the shootings and denied his personal involvement." *Id.*

However, the Defendant offers a different account of the alleged confrontation on Thalia Street, supported by a statement given by Mr. Williams.  Def. Mem. Supp. Mot. Suppress, Ex. K.  Mr. Williams, in his statement, alleges that as he and Mr. Preston were "about to buy cigarettes" from a man who lives on the 2100 block of Thalia Street, "all of the [sic] sudden, two cops pulled up in their car, jumped out and pulled out their guns." *Id.*  According to Mr. Williams, he and Mr. Preston asked why they were pulling out their guns, and the cops did not answer but told them to get to the ground.  *Id.*  Then, Mr. Williams alleges that the cops pushed them to the ground, handcuffed them, and searched Mr. Preston.  *Id.*

### D.  Procedural Background

An evidentiary hearing was held to determine the factual circumstances surrounding the arrests, searches, and statements.[1]  Generally, when the defendant files a motion to suppress under Rule 41(h), the defendant has the initial burden of establishing that the search was obtained in violation of constitutional rights if the police searched under a warrant.  *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001)

---

[1] An evidentiary hearing is required on a motion to suppress only when necessary to receive evidence on an issue of fact.  *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983).  An evidentiary hearing need not be set as a matter of course, but only if the motion alleges facts that, if proved, would require the grant of relief.  Id.  Factual allegations set forth in the defendant's motion or in accompanying affidavits must be sufficiently definite, specific, detailed, and nonconjectural to conclude that a substantial claim is presented; general and conclusory claims or those founded upon mere suspicion or conjecture are insufficient.  *Id.*  Necessarily, then, "the determination of whether a hearing is required [. . . depends] upon the particular facts which attend a particular request, and the district court is properly left with a certain amount of discretion in this regard."  *Id.* (quoting *United States v. Losing*, 539 F.2d at 1178) (internal quotation marks omitted).  This Court held an evidentiary hearing to determine issues of fact that, if proven, would substantiate Defendant's claims.

(citing *United States v. Roch,* 5 F.3d 894, 897 (5th Cir.1993); *United States v. de la Fuente,* 548 F.2d 528, 533 (5th Cir.1977), *cert denied* 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977)).  If the government seized or searched without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the search was constitutional pursuant to one of the exceptions to the warrant requirement. *See id.*

## II.   ANALYSIS

In his Motion to Suppress, the Defendant seeks to suppress any evidence obtained following the arrests and searches of December 8, 2011, and January 11, 2011 and any statements made without the presence of counsel after the December 8, 2011 and January 11, 2011 arrests.  Def. Mot. Suppress, R. Doc. 118.  As noted above, the Defendant contends that the evidence gathered in relation to both his January 11, 2011 and December 8, 2011 arrests should be suppressed based on five grounds, four of which are placed at issue before the Court:

(1) the affiant providing information for the arrest warrant affidavit and search warrant affidavits for his vehicle and apartment falsified information, making those warrants unconstitutional;

(2) Defendant's statements made to police after each arrest were made without counsel present;

(3) the search warrant for the Defendant's apartment was unconstitutionally vague; and

(4) the police officers lacked reasonable suspicion in making the December 8, 2011

investigatory stop.[2]

The Court will address each of the alleged grounds *in seriatim*.

### A.   Sufficiency of Arrest and Search Warrant Affidavits

The Defendant's motion to suppress asserts that the Government obtained

evidence in violation of the Fourth Amendment to the United States' Constitution.  The

Fourth Amendment plainly requires that a warrant issue only "upon probable cause,

supported by oath or affirmation…" U.S. Const. Amendment IV.  Though the Fourth

Amendment "says nothing about suppressing evidence," the prudential "exclusionary"

rule may be used to suppress the evidence where the remedy would deter future Fourth

Amendment violations.  *Davis v. United States*, 131 S.Ct. 2419, 2426-27, 180 L.Ed.2d

285 (2011).

Under the exclusionary rule, courts must suppress evidence seized on the basis of

a warrant unsupported by probable cause. *United States v. Pope*, 467 F.3d 912, 916 (5th

Cir. 2006).  In determining whether to apply the exclusionary rule, the court applies a

two-step test: first, the court must ask whether the good-faith exception to the rule

applies, and second, the court must ask whether the warrant was supported by probable

cause.  *United States v. Mays*, 446 F.3d 335, 342-43 (5th Cir. 2006).  If the good-faith

exception applies, the court need not inquire whether probable cause existed.  *Id.* at 343.

---

[2] The Defendant also asserted that he invoked his right to remain silent toward the end of his January 11, 2011 interview by stating that he was not going to "incriminate himself" and that any statements made thereafter should be suppressed.  Def. Mem. Supp., R. Doc. 118, 12-13.  While the Government takes the position that Mr. Preston's Fifth Amendment rights were not violated, the Government also stated that "it will not seek to introduce into evidence that portion of Preston's statement that follows his statement 'remain silent.'" Govt. Mem. Opp., R. Doc. 135, 12. Thus, the Court will not address this ground in this opinion.

The "good faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *Pope*, 467 F.3d at 916 (citation and internal quotation marks omitted). In determining whether the officers were in good faith, the court may examine "all of the circumstances surrounding the issuance of the warrant." *Id.*

The court will uphold officers' good faith reliance on a warrant, unless one of the four exceptions set forth by the Supreme Court applies:

> (1) the issuing-judge was "misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) the issuing-judge "wholly abandoned his judicial role" in such a manner that "no reasonably well trained officer should rely on the warrant"; (3) the warrant was "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant was facially invalid.

*United States v. Gibbs*, 421 F.3d 352, 355 (5th Cir. 2005) (quoting *United States v. Leon*, 468 U.S. 897, 923, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (internal quotation marks omitted); *United States v. Sibley*, 448 F.3d 754, 757-58 (5th Cir. 2006).

In this matter, Defendant places the second exception at issue. The Defendant alleges that Officer Pollard falsified information in his affidavit, which supported the arrest warrant and information provided in the search warrants, and that the credibility of the affiant of the search warrant, Detective Germann, was similarly suspect. "There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant." *Franks v. Delaware*, 438 U.S. 154, 171-72, 98 S. Ct. 2674, 2684-85, 57 L. Ed. 2d 667 (1978); *see also* United States v. Craig, 861 F.2d 818, 821 (5th Cir. 1988) ("Issuance of a warrant by a magistrate normally suffices to establish good faith on the

part of law enforcement officers who conduct a search pursuant to the warrant."). Nevertheless, the Supreme Court has held that if a defendant makes sufficient allegations of reckless disregard, and if, notwithstanding the falsified content, there remains insufficient content in the warrant affidavit to support a finding of probable cause, an evidentiary hearing must be held to determine the verity of the affidavit.[3] Thereafter, if the defendant fails to establish an intentional falsity or reckless disregard for the truth by a preponderance of the evidence, the good-faith exception applies and the court may consider the entire affidavit. *See United States v. Cavazos*, 288 F.3d 706, 710 (5th Cir. 2002).

Defendant contends that the affidavits submitted in support of the December arrest warrant and the January search warrants were "compromised by their inclusion of false information from Detective Pollard." Def.'s Mem. Supp. Mot. Suppress, R. Doc. 118, at 8. Specifically, the Defendant alleges that information in Officer Pollard's account of one particular narcotics transaction was falsified. *Id.* at 8-9. The affidavit is wholly comprised of Officer Pollard's account of a narcotics transaction involving the Defendant and another individual identified as Mark Dupas. Def. Mot. Suppress, Ex. A As stated above, Officer Pollard's account, which was recorded in his affidavit, differs from that given by Mr. Dupas in his 2012 statement. The Defendant also suggests that Officer Pollard's credibility is suspect, based on a single press article recounting his "several instances of 'payroll fraud'" as well as having four citizen complaints."[4] Based

---

[3] *Franks*, 438 U.S. at 172; *United States v. Arispe*, 328 F. App'x 905, 906-07 (5th Cir. 2009). Thus, with respect to *Franks* hearings, the Fifth Circuit has held that a defendant is entitled to an evidentiary hearing on a motion to suppress evidence if he shows that (1) allegations in a supporting affidavit were deliberate falsehoods or made with a reckless disregard for the truth, and (2) the remaining portion of the affidavit is not sufficient to support a finding of probable cause. *United States v. Brown*, 298 F.3d 392, 395-96 (5th Cir. 2002).

[4] Def.'s Mem. Supp. Mot. Suppress, Ex. H

on these discrepancies and Officer Pollard's alleged lack of credibility, the Defendant claims that the warrants contained false information and resulted in unconstitutional searches and arrest of the Defendant.

The Defendant also attacks the constitutionality of the search warrants, by questioning the credibility of the confidential informant mentioned in the affidavit supporting the search warrants; by questioning the credibility of the affiant, Detective Germann; and by noting that the affidavit supporting the warrants included Officer Pollard's allegedly falsified account of the Dupas arrest.  The Defendant questions the credibility of Detective Germann, citing another press article concerning the large number of citizen complaints received while he worked the River Garden area detail.[5] The Defendant also alleges that, notwithstanding the "highly speculative and uncorroborated officer statements in the search warrant . . . , the only other non-speculative element to the affidavit relates to a controlled purchase from an unnamed confidential informant" that alone is not sufficient to establish probable cause.  *Id.* at 11 n.8.

### 1.  Information in Affidavit Supporting the Arrest Warrant

At the hearing, Officer Pollard testified that, over the five years that he acted as the liason officer between the Sixth District and the Housing Authority of New Orleans (HANO) and having his office at the Guste Highrise Development, he witnessed ongoing drug-related activity occur on Simon Bolivar Avenue.[6]  From one of the several vantage points from the Guste building, including his office on the first floor of the building facing Simon Bolivar Avenue, Officer Pollard repeatedly witnessed residents of the

---

[5] Def.'s Mem. Supp. Mot. Suppress, Rec. Doc. 118, at 10 n.7.
[6] Mot. Suppress Hr'g Tr. 8-9, 14, March 26, 2014.

Guste high-rise and other individuals engage in what he believed to be transactions consistent with hand-to-hand narcotics purchases.[7]  In particular, Officer Pollard observed Gie Preston repeatedly engage in these types of transactions on Simon Bolivar Avenue on a nearly daily basis.[8]  On two occasions, Officer Pollard observed Gie Preston remove an object from his mouth and hand it over to an individual with him, after receiving currency; Officer Pollard then affected arrests on the buyers, receiving the contraband on their person, which tested positive for crack cocaine.[9]

On December 20, 2010, Officer Pollard testified that he again witnessed Preston and another individual standing on the corner of Simon Bolivar Avenue near Clio Street engage in a mouth-to-hand transaction, the same type of transaction Officer Pollard had witnessed Mr. Preston engage on several prior occasions.[10]  Officer Pollard left his surveillance location in the Guste high-rise and proceeded in his vehicle to conduct a stop on the individual, later identified as Mark Dupas.[11]  When Officer Pollard asked Mr. Dupas to approach his vehicle, Mr. Dupas threw an object to the ground, which was later identified as contraband and tested positive for crack cocaine.[12]  In contrast to Mr. Dupas's statements, Officer Pollard maintained that Mr. Dupas was not riding a bicycle; if he had been riding a bicycle at the time of arrest, the bicycle would have had to be placed in the police station property room as part of standard protocol.[13]

In addition, Officer Pollard testified that he would not have had any visual of the area behind a residence on Simon Bolivar Avenue, nor would he have attempted to make

---

[7] Hr'g Tr. 13-14; 25; 27.
[8] Hr'g Tr. 12, 14.
[9] Hr'g Tr. 13-14.
[10] Hr'g Tr. 14, 15.
[11] Hr'g Tr. 15.
[12] Hr'g Tr. 15.
[13] Hr'g Tr. 16.

a "walled off stop" of a drug customer if he had not witnessed a drug purchase transaction take place.[14]   Moreover, as counsel for the Government and Officer Pollard noted, Defendant's allegation and Mr. Dupas's statement that the drug transaction took place out of view of Officer Pollard defies common sense: Officer Pollard would have no reason to attempt a stop of a drug customer without having witnessed a transaction in an area where drug transactions and arrests were frequent and visible.[15]

As to his alleged payroll fraud and negative history, Officer Pollard explained that he received only one count of payroll fraud and was not charged but given a one month suspension.  *Id.* The circumstances reflect a misunderstanding of office protocol regarding logging of hours when Officer Pollard performed another officer's shift as a favor, which resulted in an overlap of four hours.  *Id.*  Ultimately, it is the Court's opinion that this prior history does not tarnish Officer Pollard's credible account of the Defendant's drug activity around the Guste highrise and the Dupas arrest.

According to Mr. Dupas, however, Officer Pollard's account is incorrect.  In observing Mr. Dupas's demeanor and lack of candor in answering questions asked of him, the Court is not inclined to afford Mr. Dupas's account of the events significant weight.[16]  When under cross-examination by the Government, Mr. Dupas initially flatly denied ever having bought drugs from Mr. Preston.  *Id.*  Yet, in his 2012 interview with Agent Meyers, Dupas stated that he "purchased ($10) dollars of crack cocaine from PRESTON and secreted it in his mouth."  Def. Mot. Suppress, Ex. B.  Later, at the hearing, Mr. Dupas testified that he merely did not know the identity of the individual

---

[14] Hr'g Tr. 16.
[15] Hr'g Tr. 55.
[16] Hr'g Tr. 55-56.  The Court also takes cognizance of Mr. Dupas's criminal history, which does not exhibit respect for the law: Mr. Dupas testified that he has been arrested "probably" over 60 times and is a life-time drug user.  *Id.*

from whom he purchased the drugs, but that he met Mr. Preston in jail sometime later in 2011 and identified him as the person from whom he bought drugs. Again, Mr. Dupas was less than forthcoming about a prior hand-written statement he made regarding the December 2010 purchase. As requested by Mr. Preston, Mr. Dupas submitted the statement denying ever having purchased drugs from Mr. Preston; Mr. Dupas stated in his interview with Agent Meyers that the statement was false; at the suppression hearing, Mr. Dupas stated that he did not state that the statement was false, but that "all [he] told them was [he] didn't find out who [Mr. Preston] was until come to find out that [Mr. Preston] was that same person" who had sold him drugs. *See* Def. Mot. Suppress, Ex. B. The Court also notes that the interview contradicting the events recounted by Officer Pollard took place years after the event.[17]

Ultimately, the Court credits the testimony of Officer Pollard regarding the circumstances surrounding the Dupas arrest on December 20, 2010, and finds that Mr. Dupas's account does not discredit Officer Pollard's account. Thus, the Defendant has failed to show that Officer Pollard's statements exhibit any reckless disregard for the truth, and the good faith exception is applicable as to the arrest warrant.

### 2. Information in Affidavits Supporting the Search Warrants

In the affidavits supporting the search warrants for Mr. Preston's automobile and apartment, Detective Germann provides a summary of Officer Pollard's account of the Dupas arrest, his own observations of Mr. Preston's drug-related activity, and his first-

---

[17] Def. Mot. Suppres, Ex. B. The interview took place on May 10, 2012. *Id.* While the Court notes that Mr. Dupas does not stand to gain from lying about the December 2010 events, as Defendant contends, Mr. Dupas's history of giving statements, recanting those statements, and lying to protect Mr. Preston does not convince the Court of his truthfulness.

hand account of a controlled purchased involving a confidential informant.  Def. Mot.
Suppress, Ex. D, E.

   Detective Germann testified at the hearing that he began an investigation of Mr.
Preston after Officer Pollard informed the Sixth District Narcotics Unit of Mr. Preston's
ongoing drug activity that he had been witnessing.[18]  Using that information, Detective
Germann conducted surveillance from the Guste highrise and witnessed what he believed
to be mouth-to-hand narcotics transactions on at least three occasions before his arrest in
January.[19]  During his surveillance, Detective Germann and other officers from his unit
observed Mr. Preston's residence.[20]  He also observed Mr. Preston using a vehicle and
retrieving objects from the vehicle and placing them in his mouth.[21]  However, Detective
Germann did not affect arrests of any purchasers because of the fear that any exposure of
the narcotics unit to the community would result in an "automatic shut-down" of the drug
activity.[22]  Thus, having been unsuccessful in arresting drug customers, the officers
decided to conduct a controlled purchase with a confidential informant.[23]  Detective Evan
Cox provided the confidential information, who was searched prior to the controlled
purchase and had been used successfully in other operations.[24]  Detective Germann
testified at the hearing and stated in his affidavit that he witnessed the confidential
informant from his surveillance position engage in a transaction with Mr. Preston and

---

[18] Hr'g Tr. 78.
[19] Hr'g Tr. 79-80.
[20] Hr'g Tr. 78, 100. The brick building was behind a separate structure connected by stairs or a walkway;
Detective Cox testified to the fact that Detective Germann conducted surveillance knew of the units of
apartment. *Id.* at 111.
[21] Hr'g Tr. 80.
[22] Hr'g Tr. 81-82.
[23] Hr'g Tr. 82.
[24] Hr'g Tr. 105-09. Detective Cox testified that he maintained full visual until the confidential informant
proceeded to Detective Germann's visual; that Detective Cox has used the informant several times before;
that the informant had gone through background checks in the past; and that the informant had history of
small narcotics usage and petty theft.

hand over what he purchased to Detective Cox.[25]  Detective Germann later placed that evidence on the books and discovered that it tested positive for crack cocaine.[26]

After the controlled purchase, Detective Germann obtained search warrants for Mr. Preston's automobile and apartment.[27]  On the day of his arrest, Detective Germann observed Mr. Preston again engage in actions consistent with mouth-to-hand drug transactions.[28]

As to Defendant's claim of his "speculative" account based on a history of citizen complaints, Detective Germann explained the deceiving nature of the article cited by the Defendant.[29]  Because the New Orleans Police Department is mandated to take any complaint against a police officer, and the complaints remain on file even if proven false, the amount of complaints against a police officer is not a clear indication of an officer's improper behavior.[30]

As stated above, the Court finds that Officer Pollard's account of the Dupas arrest is accurate.  Likewise, the Court finds that Detective Germann did not falsify any information in the affidavits supporting the search warrants.  Detective Germann gave a non-speculative account of the activity he witnessed, including the activity surrounding the controlled purchase, regardless of the confidential informant's own credibility; at issue is "[t]he deliberate falsity or reckless disregard . . . [of] only . . . the affiant, not of

---

[25] Hr'g Tr. 84.
[26] Hr'g Tr. 84.
[27] Hr'g Tr. 84.
[28] Hr'g Tr. 85.
[29] Hr'g Tr. 75.
[30] Hr'g Tr. 75-77. Detective Germann gave an example of the dubious nature of the complaints: "one of my complaints was that I waved to somebody and they felt that that sent the wrong message to the community." *Id.* at 75.  Moreover, because officers are often removed from areas where they receive numerous complaints, Officer Germann explained that some communities rife with gang activity—like the River Gardens area where he was assigned—abuse the system by submitting frivolous complaints to remove an officer from the area. *Id.* at 77.

any nongovernmental informant." *Franks*, 438 U.S. at 438.  Given that no exception to a finding that the officer's relied on the search warrants and arrest warrant in good faith applies, the Court examines the good faith of the officers in enforcing the warrants.

Given the circumstances surrounding the issuance of each warrant, the Court finds that the officers were in good faith in executing the warrants.  All officers had taken part in conducting an ongoing investigation and used reliable sources to establish probable cause in each affidavit supporting the warrants.  The officers were therefore objectively reasonable in relying on and executing the warrants issued by the magistrate.

**B.       Statements Made Without the Presence of Counsel**

Defendant contends that "any interrogation of Mr. Preston in the absence of counsel, including his January 11, 2011 arrest and December 8, 2011 interrogation[]," including post-arrest statements regarding his alleged possession of a gun in the course of alleged drug activities made to Detective Germann on January 11, should be suppressed. Def. Mem., R. Doc. 118, at 12, 14.  Supporting this assertion, Defendant claims that because Mr. Preston was represented by counsel at the time of this conversation in other pending cases involving drug related charges, that the "right to counsel had attached in each case," and that at that time he should be considered represented by counsel as to the instant arrest.

Defendant stated that he was charged with: (1) distribution of marijuana following an August 15, 2011 arrest in Orleans Parish District Court, (2) conspiracy to distribute cocaine following a June 18, 2009 arrest in Orleans Parish District Court, and (3) felon in possession of a firearm following a March 24, 2009 arrest in Orleans Parish District Court.  Def. Mem. Supp., R. Doc. 118, 12.  In addition, Defendant also states that Counts

1 and 2 of the Government's indictment in this case, alleging conspiracy to distribute crack cocaine and to possess firearms for drug trafficking dating back to "a time unknown," are also "related to the charges alleged following the January 11, 2011 arrest." Def. Mem. Supp., R. Doc. 118, 13.  In other words, Defendant alleges that the Government's indictment "make[s] clear that Mr. Preston is charged with being a drug dealer who possessed guns to further his drug activity over the course of his life, relating almost any alleged prior criminal activity to the current conspiracy charges."  *Id.* Defendant alleges that the "fact that Mr. Preston had these ongoing criminal cases was clearly known to the officers involved in this arrest" given the Sixth District Narcotics Unit's familiarity with Mr. Preston and due to Officer Pollard's involvement.  *Id.*

Defendant cites Supreme Court case law in arguing that the fact that the charges are "related" therefore "extends the attachment of Mr. Preston's Sixth Amendment rights with respect to the earlier charges to the subsequent charges, including the January 11 and December 8 charges." Def. Mem. Supp., R. Doc. 118, 13.  The Supreme Court in *McNeil v. Wisconsin* stated:

> The Sixth Amendment right [to counsel], however, is offense specific. **It cannot be invoked once for all future prosecutions**, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.

*McNeil v. Wisconsin*, 501 U.S. 171, 175-76, 111 S. Ct. 2204, 2207-08, 115 L. Ed. 2d 158 (1991) (citation and internal quotation marks omitted) (emphasis added).  By contrast, the right to counsel under the Fifth Amendment is "not offense specific: Once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding *any* offense unless counsel is present." *Id.* at 177 (quoting

*Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988)).  Yet, the

Supreme Court does not conflate the two rights, and it rejected the Petitioner's argument

in *McNeil* attempting to do just that:

> He contends that, although he expressly waived his *Miranda* right to counsel on
> every occasion he was interrogated, those waivers were the invalid product of
> impermissible approaches, because his prior invocation of the offense specific
> Sixth Amendment right with regard to the West Allis burglary was also an
> invocation of the non-offense-specific *Miranda–Edwards* right. We think that is
> false as a matter of fact and inadvisable (if even permissible) as a contrary-to-fact
> presumption of policy.

*Id.*  Likewise, Defendant is attempting to assert that his Sixth Amendment rights, which

attached to the earlier charges, extend to the subsequent charges simply because they are

"related":

> The fact of conspiracy counts in the indictment makes clear that the attachment of
> the right to counsel following Mr. Preston's then-pending March 24, 2009 arrest
> and charges for felon in possession of firearms effectively invoked his Fifth
> Amendment and Sixth Amendment rights to counsel for all related charges
> including those alleged in this indictment.

Def. Mem. Supp. Mot. Suppress, R. Doc. 118, at 14.  This argument fails not only

because the Sixth Amendment right to counsel is offense specific, but also because it

cannot be used to invoke the non-offense specific Fifth Amendment right to counsel.[31]

The argument that the past charges or "offenses" are "related" was addressed by

the Supreme Court in *Texas v. Cobb*, where the Supreme Court rather clearly stated:

> Some state courts and Federal Courts of Appeals, however, have read into
> *McNeil's* offense-specific definition an exception for crimes that are "factually
> related" to a charged offense.  Several of these courts have interpreted *Brewer v.*
> *Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), and *Maine v.*
> *Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985)—both of which

---

[31] *McNeil*, 501 U.S. at 178-79, 111 S. Ct. 2204, 2209, 115 L. Ed. 2d 158 (1991)
("[T]o find that [the defendant] invoked his Fifth Amendment right to counsel on the present charges
merely by requesting the appointment of counsel at his arraignment on the unrelated charge is to disregard
the ordinary meaning of that request.") (citation and internal quotation marks omitted).

were decided well before *McNeil*—to support this view, which respondent now invites us to approve. We decline to do so.

*Texas v. Cobb*, 532 U.S. 162, 168, 121 S. Ct. 1335, 1340-41, 149 L. Ed. 2d 321 (2001). Instead, the Court held that the Sixth Amendment applies to those "offenses" even if not formally charged that would be considered the "same offense" under the *Blockburger* test: "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Cobb*, 532 U.S. 162, 173, 121 S. Ct. 1335, 1343, 149 L. Ed. 2d 321 (2001) (citation and internal quotation marks omitted). Thus, the fact that the prior charges are factually "related" is not sufficient to extend the Sixth Amendment right to counsel.  Defendant's argument that a federal conspiracy charge somehow "relates" to all prior drug charges or possession of firearms in his lifetime is inapposite: the very fact that the Government must prove the element of *conspiracy* distinguishes the charge from any other past charge involving drug activity.[32]

In sum, the Court agrees with the Government that the legal theory advanced by the Defendant "has no basis in law" and finds that the Defendant's right to counsel did not extend to the January 11, 2011 and December 8, 2011 post-arrest statements and any statements made need not be suppressed.

## C.    Search Warrant's Description of Premises

Defendant claims that the search warrant for his apartment contained an unconstitutionally vague description of his apartment.  Def. Mem. Supp., R. Doc. 118,

---

[32] *See* 21 U.S.C. § 846 Conspiracy to Distribute and Possess Cocaine Base; 18 U.S.C. § 924(o) Conspiracy to Possess Firearms in Furtherance of Drug Trafficking.

14-15.  For a warrant to comply with the Fourth Amendment, "the warrant can be issued

only upon probable cause, supported by affidavit, particularly describing the property and

place to be searched." *Steele v. United States*, 267 U.S. 498, 501, 45 S. Ct. 414, 415, 69

L. Ed. 757 (1925).  To be constitutionally sufficient, "[i]t is enough if the description is

such that the officer with a search warrant can, with reasonable effort ascertain and

identify the place intended."  *Id.* at 503, 45 S. Ct. 414, 416, 69 L. Ed. 757 (1925).  The

search warrant in this matter described the building to be searched as a "[s]econd floor

wooden structure attached to the rear of the brick apartment complex labeled with the

municipal address of 1329/1327 St. Phillip St., New Orleans, LA." Def. Mot. Suppress,

Ex. E.  The Defendant asserts that the apartment was rather "an *unattached* building

approximately ten feet *behind* 1327-29 St. Phillip Street." Def. Mem. Supp., R. Doc. 118,

14.

      The Defendant fails to cite any Fifth Circuit case law supporting the contention

that the "attached" wooden building which was apparently "unattached" is not

sufficiently particular.  On the contrary, Fifth Circuit jurisprudence supports the opposite

conclusion.  In *United States v. Avarello*, the Fifth Circuit stated:

> An error in the description of a premises to be searched is not automatically fatal
> to the validity of a search warrant. We have upheld a search where the wrong
> numerical address was given, *United States v. Melancon*, 462 F.2d 82, 94 (5th
> Cir.), Cert. denied, 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 487 (1972), and
> where the wrong street address was given, *United States v. Darensbourg*, 520
> F.2d 985, 988 (5th Cir. 1975). Here the wrong city was specified, which was
> certainly a potentially more serious error.

592 F.2d 1339, 1344 (5th Cir. 1979).  Yet the *Avarello* court did not find the incorrect

city named in the warrant to defeat the reasonableness of the search.  *Id.*  In another case,

the Fifth Circuit held that even with the wrong street address, the warrant might be valid:

> [T]he determining factor as to whether a search warrant describes the premises to be searched with sufficient particularity is not whether the description given is technically accurate in every detail but rather whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched which is not the one intended to be searched under the search warrant.

*United States v. Darensbourg*, 520 F.2d 985, 987 (5th Cir. 1975).

As applied to the instant matter, the officers had no difficulties in identifying the premises.  Whether "attached" or "unattached," only one "wooden" structure in the complex was behind the brick building, and it was connected to the brick structure by stairs or a walkway.[33]  Errors such as the wrong street address, wrong numerical address, and wrong city are far more egregious than the adjective describing the placement of the building in this warrant.  In this instance, it is clear that the description of the structure was sufficiently particular to enable officers to locate the premises with reasonable effort and not mistake the premises for any other location.

## D.      December 8, 2011 *Terry* Stop

Finally, Defendant contends that the statements and evidence in relation to the December 8, 2011 arrest should be suppressed for two reasons: (1) the police report fails to articulate any basis for reasonable suspicion to stop the Defendant and Mr. Darius Williams, and (2) the "seizure" of the Defendant and Mr. Darius Williams was an arrest rather than an investigatory stop. Def. Mem. Supp., R. Doc. 118, 17-18. First established in *Terry v. Ohio*, "it is now axiomatic that the police are allowed to stop and briefly detain persons for investigative purposes if the police have a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v.*

---

[33] Govt. Mem. Opp., Ex B; Hr'g Tr. 100.

*Sanders*, 994 F.2d 200, 203 (5th Cir. 1993)(citations omitted).  Reasonable suspicion

exists when an officer can objectively "point to specific and articulable facts, which,

taken together with rational inferences from those facts, reasonably warrant" a stop and

frisk.  *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968); *see United States v. Martinez*, 808 F.2d

1050, 1054 (5th Cir. 1987). "Whether a detention is an arrest or merely a *Terry*-stop

depends on the 'reasonableness' of the intrusion under all the facts." *United States v.*

*Martinez*, 808 F.2d 1050, 1053 (5th Cir. 1987) (citation omitted).

### 1.  Reasonable Suspicion

As the Fifth Circuit explained in *Martinez,* to pass constitutional muster: (1) "the

[the officers'] suspicion must have been based on specific and articulable facts and not

mere hunches"; (2) "[the court] must gauge those facts not individually, but in their

totality and as seen and interpreted by officers of [equivalent] experience"; and (3) "the

suspicion must justify the scope of the intrusion on privacy that results from the stop."

808 F.2d at 1054; *see Illinois v. Wardlow*, 528 U.S. 119, 123-24, 120 S. Ct. 673, 676, 145

L. Ed. 2d 570 (2000) ("The officer must be able to articulate more than an 'inchoate and

unparticularized suspicion' or 'hunch' of criminal activity.").

Defendant contends that the police report does not state facts sufficient to

establish a reasonable suspicion, which is further supported by Mr. Williams's statement.

Def. Mem. Supp., R. Doc. 118, 17-18.  The Government alleges that the circumstances

surrounding the stop were sufficient for the officers to establish a reasonable suspicion: it

occurred in a high crime area, the men appeared to be on the verge of violent behavior,

one man was armed with a screwdriver, and that man refused to cooperate upon being

given commands to drop his weapon.

The Thalia Street area where the Defendant and Mr. Williams were at the time the officers observed them is a known high-crime area.[34]  According to testimony offered at the hearing, Officer Gillard repeatedly told Mr. Preston to drop the screwdriver that he was holding in his hand and had used to point at Mr. Williams.[35]  Both officers testified that they moved their hands on top of their gun holsters, fearing that Mr. Preston would flee because he was not obeying Officer Gillard's commands.[36]  The Defendant offered Mr. Williams statement in addition to Mr. Williams' testimony at the hearing supporting a different account of the events.  Mr. Williams alleges that the officers jumped out of the car and "pushed" them to the ground, that they had not been arguing, that the officers' guns were drawn when they approached, and that Mr. Preston had not had a gun on his person.[37]  At the time they were being stopped, both Mr. Preston and Mr. Williams denied having been arguing.[38]

Being in a high-crime area may be one factor in the totality of circumstances that may support a reasonable suspicion; however, standing alone, it is not sufficient.  *Illinois v. Wardlow,* 528 U.S. 119, 124, 120 S. Ct. 673, 676, 145 L. Ed. 2d 570 (2000).  In addition, "cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."  *Id.*  Yet "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."  *Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).  Taken together, however, these factors may give rise to reasonable suspicion.

---

[34] Hr'g Tr. 130.
[35] Hr'g Tr. 113, 119 (Gillard); 132-33 (Nunnery).
[36] Hr'g Tr. 118, 130 (Gillard); 139 (Nunnery).
[37] Def. Mot. Suppress, Ex. K.
[38] Hr'g Tr. 136 (Nunnery).

Indeed, the Fifth Circuit has found reasonable suspicion existed in cases that are "less provocative" than the facts at hand.  For example, in *United States v. Wilson*, the Fifth Circuit found reasonable suspicion for a Terry stop to existed where:

> The officers, who were hired to secure a private parking lot located in a high-crime area, observed Wilson walking in between the parked cars at night concealing something beneath his shirt. Upon noticing the police, Wilson nervously attempted to evade them. These facts objectively gave the officers reasonable suspicion sufficient to effectuate a constitutional stop.

342 F. App'x 46, 47 (5th Cir. 2009).  Further, in *United States v. Wiley*, the Fifth Circuit upheld a Terry stop and frisk where the police officer conducted a traffic stop of a vehicle for the driver's failure to wear a seatbelt, ordered the driver to exit the vehicle, and performed a pat-down after noticing a pocket knife on the driver's person.  *United States v. Wiley*, 493 Fed.Appx. 481 (5th Cir. 2012).  In addition, the stop took place in a high crime neighborhood. *Id.* The Fifth Circuit noted that the "officer had reason to suspect that Wiley might be armed" after discovering the knife.

Ultimately, Officers Gillard and Nunnery point to several specific facts supporting their reasonable suspicion: that the Defendant and Mr. Williams appeared to be engaged in an argument that could have turned violent, that the Defendant was carrying a large screwdriver that could be used as a weapon, that they were in a high-crime area of the city, and that the Defendant refused to comply with Officer Gillard's command to drop the screwdriver several times. The reasonable inferences from these facts, taken together, support the conclusion that the officers had reasonable suspicion that justified their stop and frisk.

## 2.  Investigatory Stop or Arrest

26

When conducting the stop and frisk, in addition to the governmental interest in investigating crime, "there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Terry v. Ohio,* 392 U.S. 1, 23, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968). The Fifth Circuit has explained:

> [A]lthough questioning whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly is appropriate, a court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.
>
> The fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not by itself render the search unreasonable. The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize it or to pursue it.

*United States v. Sanders*, 994 F.2d 200, 204 (5th Cir. 1993) (citing *United States v. Sharpe*, 470 U.S. 675, 687, 105 S.Ct. at 1576. (internal quotations and citations omitted). Indeed, "this court [has] observed that using some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect—whether singly or in combination—do not automatically convert an investigatory detention into an arrest requiring probable cause." *United States v. Campbell*, 178 F.3d 345, 349 (5th Cir. 1999) (internal citation and quotation marks omitted). In *United States v. Campbell*, the Fifth Circuit held that it was not unreasonable for a police officer to draw his weapon, order the suspect to lie on the ground, handcuff the suspect, and frisk the suspect in the course of an investigatory stop—even when the suspect had complied with the officer's orders. *Id.* The *Campbell* court explained that ordering a subject to lie down on the ground and handcuffing of a subject may be appropriate:

As the Seventh Circuit has noted: "When a suspect is considered dangerous, requiring him to lie face down on the ground is the safest way for police officers to approach him, handcuff him and finally determine whether he carries any weapons." *United States v. Tilmon,* 19 F.3d 1221, 1228 (7th Cir.1994).

*Id.* at 349.  In *Campbell*, the defendant had complied with the officer's order to lie down, yet the Fifth Circuit noted that that "would not have precluded his reaching for a weapon" which justified handcuffing the suspect.  *Id.*  The Fifth Circuit found that "it was not unreasonable for Gentry to take the precaution of handcuffing Campbell and frisking him, [n]or was it unreasonable, as Campbell alleges, to handcuff him *before* frisking him." *Id.*

Similarly, when Officers Gillard and Nunnery observed Mr. Preston's screwdriver, which he initially refused to drop, they were reasonable in taking measures to ensure that Mr. Preston would not use the screwdriver against them or Mr. Williams. In ordering Mr. Preston and Mr. Williams to lie on the ground, handcuffing them, and frisking them for weapons, the officers acted reasonably, ensuring that the subjects did not have other weapons with which they could cause potential harm.  Indeed, the reasonable frisk led to the discovery of a rare and highly dangerous weapon.  Once the weapon was discovered, Mr. Preston was read his *Miranda* warnings and was under arrest; the search of his person and the evidence recovered thereafter falls within the scope of a search pursuant to his arrest.  Therefore, the evidence recovered pursuant to the December 8, 2011 arrest shall not be suppressed.

### E.     December 8, 2011 Post-Arrest Statements

The Defendant contends that the statements made to three detectives after his December 8, 2011 arrest should be suppressed because the Defendant had not been advised of his Fifth Amendment rights under *Miranda* prior to giving any statements to

the detectives.  R. Doc. 141, 1.  Additionally, the Defendant contends that, under Rule 16 of the Federal Rules of Criminal Procedure, the Government should be prohibited from using the statement at trial in light of that fact that the existence and substance of the statement was not disclosed until March 11, 2014, nearly two years after the statement was made.  R. Doc. 141, 3.

Officer Nunnery testified at the hearing that he read Mr. Preston his *Miranda* rights following his arrest, while Mr. Preston was standing by the police vehicle after Officer Gillard conducted a frisk, and again once the officers arrived at the police station.[39]  Officer Nunnery further testified that he asked Mr. Preston whether he understood his rights and asked if he would speak to the detectives, to which Mr. Preston replied in the affirmative to both questions.[40]  According to Officer Nunnery, only a few minutes elapsed between the time when he read Mr. Preston his *Miranda* rights and when he brought Mr. Preston to the detectives.[41]

The report included with the Defendant's Motion to Suppress as Exhibit F, is New Orleans Police Department Incident L-11959-11, which states in pertinent part: "While at the Sixth District Station Preston was interviewed by the Sixth District Detectives Sgt. S. Contreras, Rob Barrere, and Tom Sison."  While Defendant's counsel may not have been aware of the substance of the statements made by Mr. Preston until March of 2014, the Court presumes that counsel was aware that this interview occurred after Mr. Preston's December arrest.

Defendant asserts that, even if the officers testify to the fact that Mr. Preston was given his *Miranda* warnings prior to the interview, "any representation by the arresting

---

[39] Hr'g Tr. 138.
[40] Hr'g Tr. 134-35.
[41] Hr'g Tr. 136.

officers that they provided *Miranda* warnings is false." Def. Supplemental Mem. Supp.

Mot. Suppress, Rec. Doc. 141, 2.  In addition, Defendant contends that Mr. Preston did

not waive his rights and his waiver cannot be presumed when making statements to

officers who did not warn him of his *Miranda* rights—a premise for which, again,

Defendant cites no law.  *Id.*

      After witnessing testimony at the suppression hearing and reviewing the police

report detailing the same, it is clear that Officer Nunnery read Mr. Preston his *Miranda*

rights.  It is also clear that by agreeing to speak with and by making statements to the

ATF Detectives, Mr. Preston knowingly waived his *Miranda* rights.  To be valid, the

waiver must be made knowingly, intelligently, and voluntarily.  *United States v. Oliver*,

630 F.3d 397, 409-10 (5th Cir. 2011); *see* also *Soffar v. Cockrell*, 300 F.3d 588, 592 (5th

Cir. 2002)("In order for a criminal suspect to validly waive his *Miranda* rights, two

elements are necessary: (1) the relinquishment of the right must be voluntary in the sense

that it was the product of a free and deliberate choice; and (2) the waiver must be made

with full awareness of the right being abandoned and the consequences of doing

so.")(citation and internal quotation marks omitted).

      The Fifth Circuit in *Soffar* found that despite receiving multiple *Miranda*

warnings, the defendant, Soffar, "continued to talk to the police, waiving his right to

remain silent and his right to have an attorney present." 300 F.3d at 592.  For example, in

that case, "shortly after Officer Raymond Willoughby arrested Soffar and read him his

*Miranda* rights from a card, Soffar waived his *Miranda* rights by spontaneously

volunteering incriminating statements about his involvement in the bowling alley

murders."  *Id.*  Then, after receiving *Miranda* warnings first from a magistrate "and then

from Clawson at the police station, Soffar stated that he understood his rights and waived them again by voluntarily telling the police about a potential accomplice." *Id.*

Here, as Officer Nunnery testified at the hearing, Mr. Preston was advised of his rights and asked whether he would speak with ATF Detectives by Officer Nunnery.  Mr. Preston has provided no evidence that he did not knowingly or voluntarily speak with the Detectives.  Thus, the Court does not find that Mr. Preston's Fifth Amendment rights were violated in this instance.  Accordingly,

**IT IS ORDERED** that the Defendant's Motion to Suppress Evidence and Statements (R. Doc. 118) is **DENIED.**

New Orleans, Louisiana, this  12th  day of May, 2014.


_____
**STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT JUDGE**